# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

NITZA SCARBRO,             )
                                 )
       Plaintiff,          )
                                 )
v.                            )        No. 3:15-cv-01023
                                 )        Judge Trauger
                                 )
ANDREW SAUL,[1]        )
Commissioner of Social Security,  )
                                 )
       Defendant.       )

## MEMORANDUM

The plaintiff, Nitza Scarbro, filed this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") against the defendant, Andrew Saul, Commissioner of the Social Security Administration ("SSA"). The plaintiff asserts claims for sexual harassment, hostile work environment, and retaliation. Before the Court is the defendant's Motion for Summary Judgment (Docket Entry No. 85), contending: (1) that the plaintiff's claims of sexual harassment and hostile work environment fail because the allegedly harassing actions by her coworker were not sufficiently severe and pervasive to establish a hostile work environment; (2) that the plaintiff cannot show that the defendant is liable for her coworker's actions because agency management took prompt and appropriate corrective action when the plaintiff reported her concerns; (3) that the plaintiff's retaliation claim fails because any allegedly retaliatory harassment by her coworker was not sufficiently severe to dissuade her from filing a charge of discrimination, and any alleged harassment by supervisors was not sufficiently severe or pervasive; and (4) that, to the extent the plaintiff alleges her non-selection to a Hearing Office Director position was based upon retaliation, she cannot show

---

[1] Andrew M. Saul became Commissioner of the Social Security Administration on June 17, 2019, and is therefore substituted as Defendant. *See* Fed. R. Civ. P. 25(d).

that the deciding official for that position had knowledge of her protected activity. (Docket Entry No. 86, at 5.)

For the reasons stated herein, the defendant's motion will be granted.

## I. FACTUAL BACKGROUND

### A. Background

The plaintiff, a female, worked as a GS-12 Operations Supervisor in the Social Security Administration's ("SSA" or "the agency") Nashville, Tennessee field office. (Docket Entry No. 92, the plaintiff's Response to the defendant's Statement of Undisputed Facts, at ¶ 1.) Dan Phillips, a male, worked as a GS-12 Staff Assistant in the same office as the plaintiff. *Id*. at ¶ 2. District Manager Mark Blythe and Assistant District Manager Joshua Horn were the second- and first- line supervisors, respectively, for both the plaintiff and Phillips. *Id*. at ¶ 3. In addition to the above-named persons, four other individuals also worked on the Nashville Field Office management team. *Id*. at ¶ 4. The plaintiff and Phillips shared a supervisory chain, but neither one was in a position to instruct the other in their job duties or performance. *Id*. at ¶ 5.

### B. September 2012 Comments

The plaintiff had worked with Phillips since 2009, but before September 2012, they had never socialized with each other outside the office or had any one-on-one personal conversations. *Id*. at ¶ 6; Docket Entry No. 86-6, at p. 3.[2] However, during management team meetings, the plaintiff, Phillips, Blythe, and Horn had all shared personal information about their families. *Id*. at ¶ 7. In particular, the plaintiff had shared that her husband was a retired military officer. *Id*. at ¶ 8. On September 30, 2012, Phillips approached the plaintiff after a meeting, told her he considered her a good friend, and

_____

[2]Unless otherwise stated, citations are to the Court's ecf pagination. References to actual deposition or exhibit pages are denoted with a "p.".

spoke with her while they were alone. *Id.* at ¶ 9. Phillips told her that he and his wife were having marital issues, that his wife wanted to have an open marriage, and asked if the plaintiff knew what an open marriage was. *Id.* at ¶¶ 10-11. The plaintiff replied that she did not know what an open marriage was and that it sounded as if he needed legal advice, and she then walked out of the room. *Id.* at ¶¶ 13-14. At her deposition, the plaintiff testified that the conversation made her feel uncomfortable. (Docket Entry No. 91-1, at pp. 30-31.) When asked if Phillips propositioned her in any way, the plaintiff testified, "No." *Id.* The plaintiff testified that she told Carmita Davis, a fellow supervisor who did not manage the plaintiff, about the conversation. *Id.* at pp. 32-33; Docket Entry No. 86-6, at p. 3. In her affidavit in support of her Equal Employment Opportunity ("EEO") complaint, the plaintiff stated that she did not initially complain to management about the September 30, 2012, conversation because she knew that Phillips was experiencing marital problems. (Docket Entry No. 86-6, at p. 4.)

The plaintiff further testified that Phillips also made two other comments in September 2012 that made her feel uncomfortable. The plaintiff testified that in September 2012, when she was collecting seven dollars from each coworker for a management function, Phillips attempted to give her ten dollars, but that she declined to take his money because she did not want to owe Phillips the three-dollar difference. (Docket Entry No. 92, at ¶¶ 16-17.) According to the plaintiff, Phillips stated that he did not want his wife to have his money, but that the plaintiff was the only woman he wanted to have his money and looked at her in an inappropriate manner. *Id.* at ¶ 18; Docket Entry No. 86-6, at p.4. On another occasion in September 2012, Phillips visited the plaintiff's cubicle and asked her to ask her husband, who worked as a contractor in Afghanistan, how he dealt with being away from his children. *Id.* at ¶ 19. Phillips was teary-eyed and began to cry. *Id.* at ¶ 20. The plaintiff responded that she would not ask her husband Phillips's question. *Id.* at ¶ 21.

The plaintiff testified that following these September comments Phillips frequently stared at her. (Docket Entry No. 91-1, at pp. 38, 40.)  However, the plaintiff and Phillips could not see each other from their respective work stations.  *Id.* at p. 39.

### C.  October 2012 Parking Lot Incident and Complaints to Management

The plaintiff testified that on one occasion in October 2012, when she left work at the end of the day, she observed Phillips at the end of the driveway of the employee parking lot.  *Id*. at p. 43.  According to the plaintiff, Davis was leaving at the same time as the plaintiff, and Davis stopped her car by Phillips and inquired as to what he was doing.  *Id*. at pp. 44-45.  The plaintiff does not recall Phillips's answer.  *Id*. at p. 45.  After talking with Davis, Phillips then drove away.  *Id*.

In early October 2012, the plaintiff reported to Horn and Blythe that Phillips made her feel uncomfortable.  (Docket Entry No. 92, at ¶ 24; Docket Entry No. 86-6, at p. 4.)  The plaintiff could not recall if the parking lot incident prompted her to tell them about her feelings toward Phillips.  (Docket Entry No. 91-1, at pp. 45-46.)  The plaintiff testified that she told them about the September 30, 2012, conversation and that Phillips made her feel uncomfortable.  *Id*. at pp. 33-34.  The plaintiff told Horn that she wanted to give Phillips the benefit of the doubt and planned to speak with Phillips and ask him to stop.  (Docket Entry No. 86-6, at p. 4.)  Blythe asked the plaintiff if she intended to file a complaint, but the plaintiff told him that she first wanted to talk to Phillips to see if she could resolve the issue.  *Id*.; Docket Entry No. 91-1, at pp. 54-55.  Approximately one week later, the plaintiff told Phillips that his personal remarks made her feel uncomfortable and asked him to stop making such remarks and for him to only discuss matters relating to work.  *Id*.; Docket Entry No. 91-1, at pp. 55-56.  Phillips responded that he did not know what she was talking about, and that Horn had already told him not to talk about his personal life at work.  *Id*.; Docket Entry No. 91-1, at p. 56.  The plaintiff

testified that thereafter Phillips would ask her work related questions that she did not believe he needed to ask. (Docket Entry No. 91-1, at p. 57.)

The plaintiff also testified that around October 2012 she experienced migraine headaches that caused nausea. *Id*. at pp. 46-47. The plaintiff had experienced migraines before in her life and attributed their cause to stress. *Id*. at pp. 47-49.

### D. October to December 2012 Lunch Incidents

The plaintiff testified that the supervisors usually went together to lunch and that she usually would ask Davis and the other supervisor, Bernard Thomason, to go to lunch. *Id*. at pp. 17, 50, 52-53. Following the above incidents, the plaintiff stopped going to lunch with Phillips, although the management team and supervisors sometimes had lunch together. (Docket Entry No. 92, at ¶ 28; Docket Entry No. 91-1, at p. 50.) However, in October or November 2012, the plaintiff was going to lunch with Horn and Davis, and Horn invited Phillips to join them. *Id*. at ¶ 29; Docket Entry No. 91-1, at p. 51. The plaintiff drove, and Phillips rode in her car, which made her uncomfortable. *Id*. at ¶ 30. On December 13, 2012, the plaintiff was again going to lunch with some coworkers on the management team, and Horn asked them to include Phillips in their lunch plans. *Id*. at ¶ 31. The plaintiff immediately reported to Blythe that she did not want to include Phillips in her lunch arrangements. *Id*. at ¶ 32. Blythe agreed that the plaintiff did not have to go to lunch with Phillips. *Id*. at ¶ 33.

On December 20, 2012, the plaintiff chose not to attend the office Christmas luncheon, because she did not want to be around Phillips. (Docket Entry No. 86-6, at p. 6; Docket Entry No. 91-1, at pp. 58-59.) Blythe asked the plaintiff how things were going between her and Phillips, and she replied that Phillips had not visited her cubicle, so she thought she was "doing fine." (Docket Entry No. 86-6, at p. 6.)

### E.  January 2, 2013 Apology

On January 2, 2013, Phillips visited the plaintiff at her desk and asked how her Christmas and family were, to which she responded they were fine. (Docket Entry No. 92, at ¶¶ 36-37; Docket Entry No. 86-6, at p. 8.)  Phillips then told her that he knew he had said at least two inappropriate things to her in the past year, and that he wanted to start over, as it was a new year. *Id.* at ¶ 38.  The plaintiff responded that he made her uncomfortable, he could not take back the things that he said, she did not want to be around him, and anything they spoke about had to be about business. *Id.* at ¶ 39.  Phillips apologized and left. *Id.* at ¶ 40; Docket Entry No. 86-6, at p. 8.

Later that day, the plaintiff spoke with Blythe about her conversation with Phillips. *Id.* at ¶ 41.  In turn, Blythe spoke with Phillips and directed him not to talk with the plaintiff about anything personal. *Id.* at ¶ 42.  On January 2, 2013, Blythe assured the plaintiff that Phillips would not bother her anymore. *Id.* at ¶ 43.  Horn also pulled the plaintiff from the workload involving medical reviews that she shared with Phillips and which Phillips monitored. *Id.* at ¶ 44; Docket Entry No. 91-1, at p. 61.  The plaintiff testified that if her unit was involved in processing medical reviews she typically needed to report to Phillips the progress of the workload about once or twice a week. (Docket Entry No. 91-1, at pp. 61-62.)  The plaintiff admitted that she believed that Horn's action was his attempt to lessen her interaction with Phillips, but stated that she still felt "uncomfortable." *Id.* at p. 62.

### F.  June 6, 2013 Only Managers on Duty

Shortly before June 6, 2013, the plaintiff observed the office calendar and noted that on June 6, all of the members of the management team, except for her and Phillips, had either scheduled leave or were otherwise going to be out of the office. (Docket Entry No. 92, at ¶¶ 45, 48.)  Although the non-managerial staff would also be working that day, the plaintiff told Horn that she would be "alone working" with Phillips on June 6. *Id.* at ¶¶ 46-47.  Horn responded that he did not see a problem and

6

thought things had been resolved. *Id.* at ¶ 49. On June 6, 2013, the plaintiff and Phillips did not work on any project together. *Id.* at ¶ 50. The plaintiff sat in a cubicle in the front of the office, while Phillips sat in the back of the office, but Phillips "came around" several times throughout the day. *Id.* at ¶ 51; Docket Entry No. 91-1, at p. 68. According to the plaintiff, "Phillips was very friendly, made loud comments and was jovial, came to [her] cubicle, came to other people's desk[s] when [she] was there[,] [h]e was very overt[,] and did things he just d[id] not usually do." (Docket Entry No. 86-6, at p. 9.) The plaintiff testified that Phillips asked her about such things as a pen and about a technician and looked for some things in a cabinet in her cubicle, which were the types of things that he did not usually do. (Docket Entry No. 91-1, at pp. 68-69.) However, Phillips did not make any inappropriate comments to the plaintiff. (Docket Entry No. 86-6, at p. 9.)

On June 9, 2013, the plaintiff became ill and was diagnosed with vertigo, which lasted four or five days. (Docket Entry No. 92, at ¶ 53; Docket Entry No. 91-1, at p. 70.) On June 24, 2013, the plaintiff reported to Blythe that she and Phillips were the only managers on duty on June 6, 2013. *Id.* at ¶ 54. Blythe responded that he could not do anything about it, because, if he did, it would look as if he were picking on Phillips. *Id.* at ¶ 55. On July 22, 2013, the plaintiff spoke with a member of the Area Director's Office, who told her that management had done everything it could do. *Id.* at ¶ 56. On July 26, 2013, the plaintiff requested that Blythe allow her to stay in her current cubicle, rather than rotate to a cubicle closer to Phillips, to which Blythe agreed. *Id.* at ¶¶ 57-58; Docket Entry No. 86-6, at p. 11; Docket Entry No. 91-1, at p. 76.

G.  September 30 and December 2013 Parking Lot Incidents

On September 30, 2013, the plaintiff was the supervisor assigned to close the office. *Id.* at ¶ 59. Although Phillips left the office before the plaintiff, he was still in his car in the parking lot when she walked to her car. *Id.* at ¶ 60. While she was sitting in her car, Phillips drove up, parked

a few feet from her for five minutes, and then drove off. *Id.* at ¶ 61; Docket Entry No. 91-1, at p. 79. The plaintiff did not look at Phillips to see what he was doing. *Id.* at ¶ 62. After Phillips left, the plaintiff spoke with the security guard on duty to confirm that he had seen Phillips move his car next to hers. *Id.* at ¶ 63.

The next day, on October 1, 2013, the plaintiff told Blythe about the parking lot incident. *Id.* at ¶ 64. However, because of the 2013 government shutdown, the entire office was furloughed beginning that day. *Id.* at ¶ 65. Blythe subsequently investigated the incident by viewing security tapes from the evening in question and speaking with the security guard. *Id.* at ¶ 66. On October 31, 2013, the plaintiff spoke to an EEO counselor by telephone, asking for guidance. (Docket Entry No. 91-1, at pp. 83-84; Docket Entry No. 86-6, at p. 12.) The plaintiff testified that the EEO counselor collected information from Blythe, Horn, Phillips, and the other two supervisors. *Id.* at pp. 84-85. The plaintiff testified that Blythe and Horn complained about having to answer questions "from a claims representative, just a plain technician," but that she did not perceive their complaining as an attempt to pressure her to withdraw her complaint. *Id.* at pp. 85-86.

On November 6, 2013, the plaintiff asked Blythe about his investigation into the incident. (Docket Entry No. 92, at ¶ 68.) Blythe reported that the security tapes did not show anything and that the security guard did not see anything unusual. *Id.* at ¶¶ 67, 69; Docket Entry No. 86-7, at p. 9. As a result, Blythe told the plaintiff that the matter was dropped. *Id.* at ¶ 70. In his affidavit to the EEO investigator, Phillips explained, in reference to the September 30, 2013, parking lot allegation, the following:

> The guard was still there. My habit is that I keep my cell phone off at work. When I get in my car, I always check my cell phone. I had several calls that I needed to attend. I did sit in my car for a while. Complainant was there. As I left, I received another phone call, so I pulled off to the side to answer the call. The reason I remember this is because the Guard asked me to help him copy the video the next day which I did.

Complainant was in her car and this is all I know. The only reason I know she was in her car was because I saw it on the video. The video did show my car and me pulling off to the side of the driveway. This is when I got a phone call. My car was not blocking the driveway. There are two driveways and I don't know which one she used.

I helped the Guard copy the video for management. It was not edited. I don't know how to edit a video on the DVR or during the copy process.

(Docket Entry No. 86-5, at p. 5.)

The plaintiff also testified that on another occasion, on December 10, 2013, she observed Phillips sitting in his car in the parking lot when she left work. (Docket Entry No. 92, at ¶ 71.) The plaintiff did not see what Phillips was doing in his car. *Id*. at ¶ 72. On January 24, 2014, the plaintiff filed a formal EEO complaint. (Docket Entry No. 86-1.) The plaintiff does not allege that Phillips made any personal or "sexual" comments to her after March 2014, but alleges that she began experiencing retaliation. (Docket Entry No. 92, at ¶ 73; Docket Entry No. 67, at ¶ 42.)

H.  Alleged Retaliation

During the week of March 31, 2014, the plaintiff was scheduled to close the office on Monday, Tuesday, Thursday, and Friday, a total of four days, because her co-supervisors had scheduled leave on some of those days. *Id*. at ¶ 74. The plaintiff requested leave for Friday of that week, but Horn required her to arrange for another supervisor to close for her. *Id*. at ¶ 75. The plaintiff testified that she believed that she was treated differently because the other supervisors had leave scheduled, but that they did not have to look for someone to close. (Docket Entry No. 91-1, at pp. 89-90.) The plaintiff was also scheduled to close the office on April 21, 2014. (Docket Entry No. 92, at ¶ 76.) However, because Phillips was still on the telephone at the office past 5:30 p.m., the plaintiff told the security guard that she was leaving and walked out of the office with another employee without locking it, as Phillips had the authority to close the office. *Id*. at ¶ 77; Docket Entry No. 91-1, at pp.

91-93. When asked if this were another incident where she felt uncomfortable, the plaintiff testified that she felt "uncomfortable around [Phillips] all of the time." (Docket Entry No. 91-1, at p. 93.)

At two management meetings in June 2014, Phillips made negative remarks about technicians in the plaintiff's unit. (Docket Entry No. 92, at ¶ 78.) Blythe told the plaintiff that he and Horn would speak to Phillips about his remarks. *Id*. at ¶ 79.

In October 2014, the plaintiff applied for a position in a different SSA component. *Id*. at ¶ 80. However, the plaintiff was not selected for the position. *Id*. at ¶ 81. The decisionmaker who made the selection was from a different component. *Id*. at ¶ 82. The plaintiff did not know who made the decision. *Id*. at ¶ 83. The plaintiff testified that she did not know "what the recommendation was" from Horn and/or Blythe and admitted that she did not know if she did not get the job because of Horn and Blythe. (Docket Entry No. 91-1, at pp. 105-06.)

In December 2014, Phillips sent the plaintiff an instant message telling her she needed to send a request for credit time or he could not certify her time and attendance sheet. (Docket Entry No. 92, at ¶ 85.) The plaintiff testified that either Horn or Blythe certified her time sheets, but that if they were not present, then Phillips "was over that." (Docket Entry No. 91-1, at p. 109.) The plaintiff then complained to management about Phillips's instant message. *Id*. at pp. 109-10. Blythe subsequently told the supervisors that they were not to certify each other's time sheets. (Docket Entry No. 92, at ¶ 86; Docket Entry No. 91-1, at pp. 109-10.) On January 26, 2015, Phillips stayed in the office past 5:30 p.m. even though he had been told by management not to stay past that time when the plaintiff was scheduled to close the office. *Id*. at ¶ 87. The plaintiff testified that she did not know when that policy went into effect. (Docket Entry No. 91-1, at p. 112.)

Finally, the plaintiff alleged that on November 7, 2015, while the plaintiff was meeting with Horn in his office, Phillips burped loudly outside Horn's office, causing Horn to laugh. (Docket Entry

No. 67, at ¶ 54.)  The plaintiff testified that this incident did not have anything to do with her complaint, but that she cited it as an example of Phillips's behavior and that management "just condoned it."  (Docket Entry No. 91-1, at pp. 113-14.)

## II.  LEGAL STANDARD

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).  In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment.  On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'"  *Id*.

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law."  *Reeves v. Swift Trans. Co.*, 446 F.3d 637, 640 (6th Cir. 2006).  A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Harris v. Klare*, 902 F.3d 630, 634-35 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record--including, *inter alia*, depositions, documents, affidavits, or declarations--that it believes demonstrate the absence of a genuine dispute over material facts.  *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A).  The non-moving party must set forth specific facts showing that there is a genuine issue for trial.  *Pittman*, 901 F.3d at 628.

The court should view the facts and draw all reasonable inferences in favor of the nonmoving party. *Id.* Credibility judgments and weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id.* The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id.* The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the nonmoving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

### III. ANALYSIS

### A. SEXUAL HARASSMENT BASED ON HOSTILE WORK ENVIRONMENT CLAIM

To establish a *prima facie* case of sexual harassment based on hostile work environment by a coworker, a plaintiff must establish that (1) she was a member of a protected class; (2) she was subject to unwelcomed sexual harassment; (3) the harassment was based on her sex; (4) the harassment unreasonably interfered with her work performance and created a hostile work environment, that is, the harassing behavior was sufficiently severe or pervasive to affect the terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment; and (5) the defendant knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action. *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008); *Newton v. Ohio Dep't of Rehab. & Correction-Toledo Corr. Inst.*, 496 F. App'x 558, 564 (6th Cir. 2012) (citing *Valentine-Johnson v. Roche*, 386 F.3d 800, 814 (6th Cir. 2004)). The defendant contends that the plaintiff fails to show that the alleged harassment was sufficiently severe or pervasive to establish a hostile work environment and that the plaintiff cannot show that the agency

is liable for Phillips's actions because agency management took prompt and appropriate corrective action as soon as it became aware of the plaintiff's concerns.

The Sixth Circuit has explained that a hostile work environment exists where

> the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. . . . Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment--an environment that a reasonable person would find hostile or abusive--is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Virgilio v. Potter*, 59 F. App'x 678, 681 (6th Cir. 2003) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-23 (1993)) (internal quotation marks and citations omitted).

There is both an objective and a subjective prong to this standard. In other words, "the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." *Black v. Zaring Homes*, 104 F.3d 822, 826 (6th Cir. 1997) (citing *Harris*, 510 U.S. at 21-22). The Sixth Circuit has recognized that the question of whether harassment is objectively so severe or pervasive as to constitute a hostile work environment is "quintessentially a question of fact." *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 310 (6th Cir. 2016) (quoting *Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006)).

In answering this question, the court must consider various factors, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. Although the work environment as a whole must be viewed by the court, including all alleged acts of harassment or abuse, if such acts are irregular and sporadic

rather than continuous and frequent, it is much more difficult to prove a hostile work environment claim. *See id*; *Smith*, 813 F.3d at 310. This is because "not all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). For example, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal citations omitted). The Supreme Court has "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment." *Id.* The Sixth Circuit "has consistently rejected any invitation to convert Title VII into a 'code of workplace civility.'" *Rayford v. Illinois Cent. R.R.*, 489 F. App'x 1, 5 (6th Cir. 2012) (citing *Grace v. USCAR & Bartech Tech. Servs.*, LLC, 521 F.3d 655, 679 (6th Cir. 2008)).

The plaintiff alleges that Phillips sexually harassed her "with a clear sexual proposition about being involved in an 'open' marriage, telling her he would rather her have his money than his wife, asking personal questions of the plaintiff about her relationship with her husband while he was away for long periods of time," and that when "she rebuffed him, he continued to insert himself into her daily work life whether repeatedly asking questions of her, instructed to include him in her supervisor lunches, waiting for her in the parking lot, or intimidating her in the office," all of which "led to nausea, anxiety, migraine headaches and vertigo." (Docket Entry No. 91, at 10-11.) The undisputed facts in the record, however, do not support the plaintiff's allegations of sexual harassment based on hostile work environment, as the plaintiff has failed to establish that the alleged conduct was severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive.

Here, the plaintiff lists the following conduct by Phillips in support of her sexual harassment claim: (1) he made inappropriate comments to her regarding his personal life in September 2012,

including that his wife wanted an "open marriage," and asked if she knew what that was; (2) in September 2012, when she was collecting money for a management function, he said that he did not want his wife to have his money, but that the plaintiff was the only woman he wanted to have his money and looked at her in an inappropriate manner; (3) in September 2012, he tearfully asked her to ask her husband how he dealt with being away from his children; (4) that he would stare at her; (5) in October 2012, he was parked at the end of the driveway of the employee parking lot when she left work for the day; (6) in October or November 2012, the plaintiff was going to lunch with Horn and Davis, and Horn invited Phillips to join them for lunch and on December 13, 2012, Horn asked the plaintiff and her co-supervisors to include Phillips in their lunch plans; (7) on December 20, 2012, she chose not to attend the office Christmas luncheon because she did not want to be around him; (8) on January 2, 2013, he asked her how her Christmas and family were and he attempted to apologize to her for his September 2012 comments, but she refused his apology; (9) on June 6, 2013, he was scheduled to work with her as the only other member of the management team on duty; (10) in September 2013, he sat in his car in the parking lot after leaving the office, drove his car and parked it a few feet from her car for a few minutes, and then drove out of the parking lot without interacting with her; (11) in December 2013, he was in his car in the parking lot when the plaintiff left work, but he did not approach or interact with her; (12) on April 21, 2014, he was still on the telephone at the office past 5:30 p.m. when she was scheduled to close, so she left, leaving the responsibility of closing with Phillips; (13) at two management meetings in June 2014, he made negative remarks about technicians in her unit; (14) in December 2014, he sent her an instant message that she needed to send a request for credit time or he would not be able to certify her time and attendance sheet; and (15) on

January 26, 2015, he stayed in the office past 5:30 p.m., even though he had been told by management not to stay past that time when she was scheduled to close the office.[3]

The alleged conduct consists of relatively infrequent and sporadic incidents over a two and one-half year period and did not involve any physical touching or any overt sexual comments. The only comments that could arguably be construed as sexual in nature are the 2012 comments about an "open marriage" and that the plaintiff was the only woman he wanted having his money instead of his wife. However, the plaintiff testified that Phillips did not "proposition" her when he made the open marriage comment. Under Sixth Circuit authority, these two September 2012 comments appear to be isolated incidents which are not, in of themselves, severe or pervasive enough to constitute a hostile working environment.

In *Graves v. Dayton Gastroenterology, Inc.*, 657 F. App'x 485 (6th Cir. 2016), Graves viewed Schum, a coworker, as a friend, and the two periodically exchanged text messages, but did not discuss anything about which Graves would not have talked to any other colleague. *Id*. at 486. While on vacation, Graves texted Schum to tell him when she would return to work and stated that she liked being on vacation, to which Schum responded, "I [sic] happy for you, you just have fun and wild sex." *Id*. at 486-87. Although Graves was offended by the message and felt it was inappropriate and unprofessional, she did not convey this to Schum. *Id*. at 487. A week later, Schum, unsolicited, texted Graves again, saying, "'You and your husband lay out a wonderful dinner an [sic] have wild sex on the table!!!!! I do think about sex all the time. I [sic] just not getting it.'" *Id*. The court concluded that the alleged conduct "was objectively neither severe nor pervasive enough to constitute a hostile work

---

[3]Some of the alleged conduct cited above overlaps with the plaintiff's retaliation claim, as it could also be construed as examples of ongoing hostile work environment conduct. The court will consider the alleged, relevant conduct as it relates to each claim.

environment." *Id.* at 489. *See also Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 351 (6th Cir. 2005) (a hostile work environment was not shown where the plaintiff alleged only three relatively isolated incidents over a period of approximately two and one-half years, that "Brock told vulgar jokes, that he twice placed his vibrating pager on her thigh as he passed her in the hall, and most significantly, he pulled at her overalls after she told him she was wearing a thong"); *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 458-59, 464 (6th Cir. 2000) (where the plaintiff was subject to four separate incidents over four years by his supervisor, which involved the plaintiff's supervisor rubbing the plaintiff's shoulder while in the supervisor's office; grabbing the plaintiff's buttocks and telling him that "she controlled [the plaintiff's] ass and she would do whatever she wanted with it;" telling the plaintiff that he should come over to test out her whirlpool with her; and telling the plaintiff that he should come over to enjoy the pool without his girlfriend, the Sixth Circuit concluded that "[w]hile the allegations [we]re serious, they d[id] not constitute conduct that [wa]s pervasive or severe."); *Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784 (6th Cir. 2000) (no objectively hostile work environment where the plaintiff's supervisor told several dirty jokes in her presence, made one verbal sexual advance towards her during her evaluation, once referred to her as "Hot Lips," and made isolated comments about her state of dress); *Burnett v. Tyco Corp.*, 203 F.3d 980, 985 (6th Cir.2000) (concluding that "a single battery coupled with two merely offensive remarks over a six-month period does not create an issue of material fact as to whether the conduct alleged was sufficiently severe to create a hostile work environment").

As to the other alleged conduct, the court does not find any of the remaining instances--considered alone or collectively with the September 2012 comments discussed above--to be "severe or pervasive" enough to constitute a hostile work environment. The record reflects that Phillips did not ask the plaintiff about her relationship with her husband, but instead inquired as to how her

husband dealt with being away from his children.  The plaintiff generally alleged that Phillips would frequently stare at her, but she provided no testimony as to any specific instances, the nature of the stares, or that she perceived them to be threatening; there was no evidence presented that she complained to management about his stares; and the plaintiff and Phillips could not see each other from their cubicles.  The undisputed facts further show that in the October 2012 parking lot incident, Phillips did not approach or speak to the plaintiff; that there was no evidence that Phillips "instructed" that he be invited to lunch, as the plaintiff testified that Horn invited Phillips to lunch and that when the plaintiff complained, Blythe agreed that she did not have to include Phillips in her lunch plans; that on January 2, 2013, Phillips apologized to the plaintiff, but she rejected it; on June 6, 2013, Phillips did not make any inappropriate comments to the plaintiff, they did not work on any projects together, and the plaintiff testified that "Phillips was very friendly," but that he did things that he usually did not do, such as asking her for a pen and about a technician; in the September 2013 parking lot incident, the plaintiff did not look at Phillips to see what he was doing in his car, he did not interact with her, and she did not allege that he blocked her car; in the December 2013 parking lot incident, the plaintiff neither saw what Phillips was doing inside his car, nor did he approach or interact with her; on April 21, 2014, Phillips was still on the telephone at the office when the plaintiff was scheduled to close, but Phillips did not approach or interact with her; in June 2014, Phillips only made negative remarks about technicians in her unit;  in December 2014, Phillips sent the plaintiff a message about certification, but she admitted that Phillips was "over that" when management was not present, and she did not present any evidence that Phillips acted outside his scope of duties; and on January 26, 2015, although he stayed in the office past 5:30 p.m., despite being told by management not to do so when the plaintiff was scheduled to close the office, there was no evidence or allegation that he approached or interacted with her or said or did anything inappropriate.

18

Accordingly, after considering the work environment as a whole, the court concludes that the plaintiff has failed to establish that any of the alleged conduct was severe or pervasive enough to rise to the level of an environment that a reasonable person would find hostile or abusive.

Because the plaintiff has failed to establish that any of the alleged conduct was severe or pervasive, the court need not address whether the defendant knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action.

## B. RETALIATION CLAIM

Under Title VII, an employer cannot retaliate against an employee who engages in any activity protected under Title VII. 42 U.S.C. § 2000e-3(a). Title VII's antiretaliation provision prohibits retaliation against the employee for the employee's opposition to any unlawful employment practice or because the employee has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under Title VII. *Id.* "The opposition clause protects not only the filing of formal discrimination charges with the EEOC, but also complaints to management and less formal protests of discriminatory employment practices." *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014). "The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006).

Absent direct evidence, the plaintiff must prove her retaliation claim using the *McDonnell Douglas* burden-shifting framework. To establish a *prima facie* case of retaliation, the plaintiff must prove that (1) she engaged in an activity protected by Title VII; (2) the defendant knew of her exercise of the protected right; (3) the defendant thereafter took an employment action adverse to the plaintiff, or that the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) a causal connection existed between the protected activity and the adverse employment action or

harassment. *Akers v. Alvey*, 338 F.3d 491, 497 (6th Cir. 2003). "To establish the third element of the *prima facie* Title VII retaliation claim, 'a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Laster*, 746 F.3d at 731 (quoting *Burlington*, 548 U.S. at 68). Courts "speak of *material* adversity because . . . it is important to separate significant from trivial harms." *Burlington*, 548 U.S. at 68 (emphasis in original). Title VII's antiretaliation provision prohibits "employer actions that are likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers. And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *Id.* (citation omitted). An objective standard is employed because "[i]t avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings." *Id.* at 68-69. The standard is phrased "in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *Id.* at 69.

"Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . . This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). "In determining whether there is a causal relationship between a plaintiff's protected activity and an allegedly retaliatory act, courts may consider whether the employer treated the plaintiff differently from similarly situated individuals and whether there is a temporal connection between the protected activity and the retaliatory action." *Barrett v. Whirlpool Corp.,* 556 F.3d 502, 516-17 (6th Cir. 2009).

"If the employee makes [a *prima facie*] showing, the burden shifts to the employer to articulate a 'legitimate, nondiscriminatory reason for its actions.' If the employer meets this burden, the employee must demonstrate that the legitimate reason offered by the employer 'was a pretext designed to mask retaliation.'" *Laughlin v. City of Cleveland*, 633 F. App'x 312, 315 (6th Cir. 2015) (quoting *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008)). A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to motivate the challenged conduct. *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 285 (6th Cir. 2012) (citations omitted).

The defendant contends that the plaintiff's retaliation claim fails because any allegedly retaliatory harassment by her coworker was not sufficiently severe to dissuade her from filing a charge of discrimination or that management condoned or was aware of the alleged retaliatory conduct and that any alleged harassment by supervisors was not sufficiently severe or pervasive. (Docket Entry No. 86, at 22.) The defendant also contends that the plaintiff cannot establish a causal connection between her complaints about Phillips and her nonselection for a position in a different component or that the decisionmaker for that position knew of her protected activity. *Id*. at 23. The plaintiff asserts that after her complaints she "was subjected to different office policies and procedures, instructed to include Mr. Phillips in her supervisor lunches, and denied a position" for which she applied; she "was required to make arrangements to cover closing when she applied for leave after her complaints," which "was something the other supervisors in the office were not required to do;" and "when she applied for a position in a different department, she was summarily denied without even an interview, a position that required the recommendation of Mr. Horn and Mr. Blythe." (Docket Entry No. 91, at 12).

The Sixth Circuit recognizes retaliation claims under three circumstances: (1) where the plaintiff suffered from some type of adverse employment action; (2) where the plaintiff was subject to retaliatory harassment by a supervisor; and (3) where the plaintiff suffered from retaliatory harassment by coworkers. *See Morris*, 201 F.3d at 792 (adverse employment action and retaliatory harassment by supervisor); *Hawkins*, 517 F.3d at 346 (coworker retaliation). Here, the plaintiff's amended complaint can be construed as asserting claims under all three retaliation theories. Thus, the court will analyze the plaintiff's claims under each theory.

### 1. Retaliation by Material Adverse Employment Action

The plaintiff alleges that the following actions by the defendant were taken in retaliation: (1) in October or November 2012, Horn invited Phillips to join her and other members of the management team for lunch, and on December 13, 2012, Horn asked her and her co-supervisors to include Phillips in their lunch plans; (2) on June 6, 2013, she and Phillips were the only managerial employees scheduled to work; (3) in March 2014, unlike other supervisors, she was required to arrange for a colleague to close for her when she scheduled leave; and (4) in October 2014, she applied, but was not selected for a position in a different SSA component. As to the first three examples, the plaintiff has failed to establish that she suffered an employment action that was *materially* adverse, as these incidents involved isolated occurrences over a two-year span and constituted mere minor annoyances.

The undisputed facts show that the management team and supervisors sometimes had lunch together and in either October or November 2012, Horn invited Phillips to join Horn, the plaintiff and another member of the management team to lunch. The plaintiff did not initially complain about this incident. In December 2012, Horn asked the plaintiff and her co-supervisors to include Phillips in their lunch plans, but when she complained to Blythe, Blythe agreed that she did not have to go to

lunch with Phillips. The plaintiff does not allege any other instances where she was required to include Phillips in her lunch plans.

The record shows that on one occasion the plaintiff and Phillips were the only members of management scheduled to work on June 6, 2013, because the other members of the management team had either scheduled leave or were otherwise going to be out of the office. The plaintiff did not present any evidence or allege that the defendant purposefully "scheduled" the plaintiff to be the only other supervisor with Phillips. The record does not show that the plaintiff made any other complaints regarding Phillips after he attempted to apologize to her six months earlier on January 2, 2013. Moreover, the plaintiff was not working "alone" with Phillips, as non-managerial employees were also working that day. Thus, the plaintiff fails to show that this incident constitutes a material adverse employment action.

The record further demonstrates only one instance where the plaintiff was required to arrange for another supervisor to close for her in March 2014. Again, the plaintiff fails to show that this lone instance constitutes a material adverse employment action that would deter a reasonable employee from making or supporting a charge of discrimination. *See Taylor v. Geithner*, 703 F.3d 328, 338 (6th Cir. 2013) (two reprimands received by Internal Revenue Service employee were not adverse employment actions required to establish Title VII retaliation claim as there was "no evidence in the record that any disciplinary action resulted from these letters, or that these letters were related to a larger pattern of intimidation by constantly reprimanding" the plaintiff).

As to the plaintiff's claim that her nonselection for a position in a different component was based on retaliation, the plaintiff fails to establish any causal connection between her complaints about Phillips and her nonselection. The decisionmaker was from a different component, and the plaintiff admitted that she did not know who made the selection decision. The plaintiff's assertion that Horn

23

and Blythe did not recommend her for the position and that she was not selected because of the lack

of a recommendation, (Docket Entry No. 91, at 14-15), lacks any evidentiary support and is merely

a conclusory allegation. The plaintiff's testimony reflected that she did not know whether Horn and/or

Blythe provided a recommendation, and she admitted that she did not know if she did not get the job

because of Horn and Blythe.[4]

## 2. Supervisory Retaliation

With respect to a retaliatory harassment claim against management, the plaintiff has failed to

present any evidence as to whether the alleged conduct amounted to "severe or pervasive retaliatory

harassment by a supervisor." The Sixth Circuit has held that severe or pervasive supervisor

harassment following a sexual harassment complaint can constitute retaliation for the purposes of a

Title VII action. *Akers*, 338 F.3d at 498. The standard for "severe or pervasive" harassment is "'the

same in the retaliation context as in the sexual and racial discrimination contexts.'" *Id.* (citation

omitted). Thus, "[u]nder this standard, the harassment must be 'sufficiently severe or pervasive to

alter the conditions of the victim's employment and create an abusive working environment.'" *Id.*

(quoting *Harris*, 510 U.S. at 21). "'[T]his test has both an objective and a subjective component: the

conduct must be severe or pervasive enough to create an environment that a reasonable person would

find hostile or abusive, and the victim must subjectively regard that environment as hostile or

abusive.'" *Id.* (citation omitted). Like claims involving hostile work environment, the "court must

consider the totality of the circumstances an employee faces, including 'the frequency of the . . .

---

[4]In her brief, the plaintiff makes the conclusory statement, "Defendant violated its own policy
and procedure in denying her the position." (Docket Entry No. 91, at 6.) The exhibit that the plaintiff
cites in support, however, merely demonstrates that she applied for a paralegal position in 2017, was
referred to the hiring manager for consideration, but was not selected. The exhibit, Docket Entry No.
91-2, does not show or mention any policy or procedure that the defendant allegedly violated.

conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Broska v. Henderson*, 70 F. App'x 262, 269 (6th Cir. 2003) (quoting *Harris*, 510 U.S. at 23).

The plaintiff alleges that, after she complained about Phillips, she was instructed, on two occasions in late 2012, to include Phillips in supervisor lunches, she was the only supervisor scheduled to work with Phillips on June 6, 2013, and in March 2014, she was required to make arrangements to cover closing when she requested leave. As discussed previously, Horn invited Phillips to lunch with the plaintiff and another coworker on one occasion in October or November 2012, and asked the plaintiff to include Phillips in her lunch plans with the other supervisors on one occasion in December 2012. However, when the plaintiff complained in December 2012, Blythe agreed that she did not have to go to lunch with Phillips. On one occasion in June 2013, the plaintiff and Phillips were the only members of management scheduled to work because the other members of the management team had either scheduled leave or were otherwise scheduled to be out of the office. The plaintiff did not present any evidence or allege that the defendant purposefully "scheduled" the plaintiff to be the only other supervisor with Phillips. The record also shows only one instance where the plaintiff was required to arrange for another supervisor to close for her in March 2014. These three isolated incidents, over a one and one-half year period, fail to establish harassment that was sufficiently severe or pervasive to enough to create an environment that a reasonable person would find hostile or abusive.

### 3. Coworker Retaliation Theory

"[I]n appropriate circumstances, Title VII permits claims against an employer for coworker retaliation. *Hawkins*, 517 F.3d at 346. The Sixth Circuit has held that an employer can be held responsible for an employee's coworker's actions if:

(1) the coworker's retaliatory conduct is sufficiently severe so as to dissuade a reasonable worker from making or supporting a charge of discrimination, (2) supervisors or members of management have actual or constructive knowledge of the coworker's retaliatory behavior, and (3) supervisors or members of management have condoned, tolerated, or encouraged the acts of retaliation, or have responded to the plaintiff's complaints so inadequately that the response manifests indifference or unreasonableness under the circumstances.

*Id.* at 347; *Laster*, 746 F.3d at 732.

The "sufficiently severe" standard requires a plaintiff to demonstrate "material adversity," meaning "significant" rather than "trivial" harm. *Burlington*, 548 U.S. at 68; *Rodriguez-Monguio v. Ohio State Univ.*, 499 F. App'x 455, 467 (6th Cir. 2012). The coworker's conduct "must be *retaliatory* conduct, not merely uncivil or even abusive behavior by itself." *Perkins v. Harvey*, 368 F. App'x 640, 647 (6th Cir. 2010) (emphasis in original). Thus, a plaintiff must produce some evidence that the complained-of actions were motivated by the exercise of the plaintiff's protected right. *Id.* at 647-48.

The court will consider the following alleged conduct by Phillips in addressing the plaintiff's coworker retaliation claim: (1) in September 2013, he sat in his car in the parking lot after leaving the office, drove his car and parked it a few feet from the plaintiff's car for a few minutes, and then drove out of the parking lot without interacting with her; (2) in December 2013, he was in his car in the parking lot when the plaintiff left work, but he did not approach or interact with her; (3) on April 21, 2014, he was still on the telephone at the office past 5:30 p.m. when the plaintiff was scheduled to close, so she left, leaving the responsibility of closing with Phillips; (4) at two management meetings in June 2014, he made negative remarks about technicians in the plaintiff's unit; (5) in December 2014, he sent her an instant message that the plaintiff needed to send a request for credit time or would not be able to certify her time and attendance sheet; (6) on January 26, 2015, he stayed in the office past 5:30 p.m., even though he had been told by management not to stay past that time when the plaintiff

was scheduled to close the office; and (7) in November 2015, Phillips burped outside Horn's office while the plaintiff was meeting with Horn, which elicited a laugh from Horn. Based upon the undisputed factual record, the plaintiff fails to show that the alleged conduct--considered alone or collectively--was sufficiently severe to dissuade a reasonable worker from making or supporting a charge of discrimination. The plaintiff only cites a few isolated and minor incidents over a two-year span that do not demonstrate material adversity.

In the two parking lot incidents in September and December 2013, the plaintiff did not see what Phillips was doing in his car, he did not approach her, he did not interact with her, and he did not block her car from leaving. On April 21, 2014, Phillips was still on the telephone at the office when the plaintiff was scheduled to close, but Phillips did not approach or interact with her or say or do anything inappropriate. There also was no evidence that, at that point in time, Phillips had been instructed not to stay after 5:30 p.m. when the plaintiff was scheduled to close. Phillips's negative remarks in June 2014 about technicians in the plaintiff's unit and then, six months later, Phillips, apparently, incorrectly telling the plaintiff that she needed to submit a request for credit time before he could certify her time sheet constitute, at worst, minor annoyances. The plaintiff cited only one instance where, on January 26, 2015, Phillips stayed in the office past 5:30 p.m., despite being told by management not to do so when the plaintiff was scheduled to close the office. However, there was no evidence or allegation that Phillips approached the plaintiff or interacted with her in any way. Lastly, the plaintiff cited that in November 2015, Phillips burped outside Horn's office while the plaintiff was meeting with Horn. However, the plaintiff testified that this incident did not have anything to do with her complaint, but was just an example of Phillips's behavior.

Accordingly, while Phillips's alleged conduct may have annoyed the plaintiff, she fails to demonstrate, under the totality of the circumstances, that such conduct was sufficiently severe as to dissuade a reasonable worker from making or supporting a discrimination charge.

## IV. CONCLUSION

For the reasons stated above, the defendant's Motion for Summary Judgment (Docket Entry No. 85) will be **GRANTED**, and an appropriate order will be filed herewith.

ALETA A. TRAUGER
United States District Judge